[No. 29305. Department Two. November 4, 1944.]

OMICRON COMPANY, INC., et al., Appellants, v. UNITED STATES FIDELITY & GUARANTY COMPANY, Respondent.[1]

[1]Reported in 152 P. (2d) 716.

*Patterson & Patterson,* for appellants.

*McClure & McClure,* for respondent.

ROBINSON, J.—On August 19, 1940, A. R. Carlson, a licensed and bonded real estate broker, purporting to act for William Mathewson, made an offer to Omicron Company, Inc.—hereinafter called Omicron—for an apartment house. The offer was accepted, an earnest money receipt was executed, and Carlson delivered to Omicron Mathewson's check for one thousand dollars. On the next day, Mathewson, learning of the transaction by a letter from Omicron, went to its office, claiming that Carlson had acted without due authority, and demanded his check. Omicron refused the demand, had the check certified, and, upon Mathewson's failure to consummate the transaction, forfeited the proceeds thereof. Subsequently, Mathewson brought an action against both Carlson and Omicron to recover one thousand dollars. Carlson defaulted, but Omicron vigorously defended. A recovery was had against each of the defendants, whereupon Omicron appealed to this court from the judgment entered against it, and the judgment was by this court affirmed. *Mathewson v. Carlson,* 13 Wn. (2d) 363, 125 P. (2d) 272.

In 1943, after paying the judgment, Omicron began this action against United States Fidelity & Guaranty Company. The complaint alleged, in substance, that in January, 1940, A. R. Carlson applied to the proper state authority for a real estate broker's license; that the defendant supplied the bond required by the statute; that said license and bond were in full force and effect during all of the calendar year 1940; and

"That while said bond and license were in full force and effect, and during the month of August, 1940, plaintiff did

sustain a loss under said bond in the sum of one thousand dollars, by reason of the failure of the said A. R. Carlson to properly account, and by reason of the wrongful conversion of trust funds by said broker, and likewise one William Mathewson claimed to have sustained a loss under similar circumstances upon said bond. That thereafter the said Mathewson brought an action against the Omicron Company, Inc., a corporation, and the said A. R. Carlson to determine the liability of the said Omicron Company, Inc. and the said A. R. Carlson in the premises, and as a result of said action the said Omicron Company, Inc. obtained and has a judgment against the said A. R. Carlson for the repayment to it by the said A. R. Carlson of said sum of one thousand dollars, which judgment represents the judgment for the recovery of funds of said Mathewson entrusted to said Carlson as Real Estate Broker, and for which he failed to faithfully account, all while the said bond executed by the defendant was in full force and effect."

The defendant admitted that it furnished the bond, but denied, substantially, all other allegations of the complaint, and set up affirmatively that:

"If the plaintiff has a judgment against A. R. Carlson for the repayment to plaintiffs of the sum of $1000.00, or any other sum, said judgment was entered in a cause to which this defendant was not a party and that this defendant is not bound thereby, and the said judgment, if entered, was not based on any default or failure of the said A. R. Carlson faithfully to account for funds entrusted to him as realtor."

Omicron then pleaded, by way of reply, that, in the suit brought by Mathewson against Carlson and Omicron, it was, among other things, adjudged as follows:

"It is ORDERED, ADJUDGED and DECREED that plaintiff be, and he is, granted judgment against defendant A. R. Carlson, and against defendant Omicron Company, Inc., a corporation, in the sum of $1,000.00 together with interest thereon at the rate of 6% per annum from August 20th, 1940, and together with his costs and disbursements herein. And that upon the payment of said judgment by the defendant, Omicron Company, Inc., a corporation, that defendant shall be subrogated and shall succeed to all rights of plaintiff against defendant Carlson and any surety upon his bond as real estate broker to the extent of such payment."

706

Omicron further pleaded that it appealed from the judgment in that case to this court, that the judgment was affirmed, and that, thereafter and prior to the institution of this action, it had paid the judgment entered against it.

■ The respondent bonding company in this action was not in any way a party in the case of Mathewson v. Carlson and Omicron in which the subrogation order, above quoted, was entered. Nor was that subrogation order affirmed, considered, or brought into question in the appeal of that case, for Omicron was the sole appellant, complaining only of the judgment against itself. Hence, the appellant's contention in this case, that it is entitled to be subrogated to the rights of Mathewson against Carlson and his surety, cannot derive any support from that order. It is plainly not *res judicata* as to respondent surety, and cannot be used to its disadvantage in this action. If appellant is entitled to be so subrogated, that must be spelled out as an equitable consequence of the acts and relationships of the parties, but we shall be better able to inquire into that matter after considering the appellant's main contention that, quite independent of subrogation, it is entitled to recover directly on the bond.

■ The condition of the bond involved in this action is as follows:

"Now, THEREFORE, If the said A. R. Carlson, the above bounden principal, shall, if said license is or has been issued to him, render a faithful accounting of all funds entrusted to him as such real estate broker by any person as provided in said Chapter 129, Extraordinary Session Laws of 1925, *and pay to any party entitled thereto all damages arising by reason of the failure of said principal to render to any person a faithful accounting of all funds so intrusted to him as such real estate broker, either directly or indirectly, then this bond shall be void and of no effect; otherwise to remain in full force and virtue."* (Italics ours.)

It is admitted that Carlson was at no time the agent of Omicron, and, therefore, under no duty to account to it directly. But, as we understand the appellant, it contends, relying upon that language of the bond which we have italicized, that Carlson failed to render a faithful accounting

to Mathewson, and attention is called to the fact :hat the surety bound itself to:

" . . . pay *to any party entitled* thereto all damages arising by reason of the failure of said principal [Carlson] to render *to any person* a faithful accounting, etc." (Italics ours.)

In other words, Omicron contends that it is a "party entitled" to one thousand dollars' damages by reason of the failure of Carlson to render a faithful accounting to Mathewson.

The respondent says, in answer to these contentions, (1) that Carlson did render a faithful account, and (2) that, if Omicron suffered any damage whatever, it was certainly not in the sum of one thousand dollars. We think the respondent is correct in both contentions.

As to (1), appellant urges that Carlson converted Mathewson's check. But, if that be so, he certainly did not convert it to his own use. He put it to Mathewson's credit on a purchase contract, albeit one which, it was later determined, Mathewson had not actually authorized him to make. This, says the respondent, is not a failure to faithfully account. Failure to account, it is said, involves something in the nature of an agent's embezzling funds of his principal and employing them for his own benefit. Whether or not this is so, it is certain that Omicron was not damaged in the sum of one thousand dollars. The sole and only reason why Mathewson recovered the one thousand dollars from Omicron in the first action (Mathewson v. Carlson *et al.*) is because Omicron never had any ownership or right to the one thousand dollars or any part of it. It was Mathewson's money all the time. Omicron was no more legally damaged *in the sum of one thousand dollars* by being compelled to return Mathewson's money to him than it would have been damaged in a like sum had it been compelled to return to its rightful owner a thousand dollars which it had found on the street.

Of course, Omicron suffered some loss in the premises by way of attorney's fees, etc., but there is no evidence in the case as to the amount thereof, and even if there were, that

it would be entitled to collect that damage from anyone would be open to serious question. The files of the case of Mathewson v. Carlson are in the record in this case as an exhibit. One of the conclusions of law in that case was that, on August 20th, the next day after the check was delivered to Omicron, its president and manager,

". . . had knowledge and reason to believe that said $1,000.00 check was an unlawful check . . . , then as between plaintiff and the defendant Omicron Company, Inc., the check was an unlawful check and defendant Omicron Company, Inc., thereafter cashed said $1,000.00 check at its peril and the money received belongs to plaintiff."

It would seem that the refusal of the Omicron Company to return the check to Mathewson on his demand made that day was in and of itself a conversion. At any rate, there is no doubt that Omicron converted the proceeds of the check. No witnesses were called by the bonding company in the trial of the action. The sole witness called by the plaintiff Omicron testified during cross-examination as follows:

"Q. And I think you said after certification of the check Mr. Mathewson made demand for return of the money? A. Yes. Q. And that was refused? A. Yes. . . . Q. And the Omicron Company, after appeal to the Supreme Court, had to pay that money? A. Yes. Q. And this suit is now brought to recover that money, is it not? A. Yes, I suppose so, yes."

We come now to the question of subrogation. We need not attempt to define the doctrine. It will be sufficient for our present purpose to call attention to one or two of its fundamental characteristics. First of all, it is a purely equitable doctrine, a fiction invented for the purpose of arriving at an obviously equitable result. It was originally applied, and still finds its most frequent application, to situations where one only secondarily liable is compelled to pay a debt for which another is directly and primarily liable. In such a case, equity puts the payor in the shoes of the creditor by subrogating him to the creditor's rights against the primary debtor.

In the very nature of things, a primary debtor can never to be entitled to subrogation. We are unable to imag-

ine an obligation more direct and primary than the obligation of one who has come into possession of the property of another, to which he has neither right of possession nor ownership, to surrender that property on the owner's demand. This Omicron refused to do. In so far as the action of Mathewson v. Carlson and Omicron Company, Inc., was waged against Omicron, it was for the purpose of enforcing that obligation. It was enforced by the judgment therein entered. Omicron was required to return the thousand dollars to Mathewson simply because it had never acquired any right to it. In performing that judgment, Omicron parted with nothing of its own, and, therefore, suffered no loss. There is, therefore, no equitable reason why the respondent bonding company should be required to indemnify it in the sum of one thousand dollars, and no other claim of loss is made. The gist of the matter is aptly put in the respondent's brief as follows:

"To require Carlson's bondsman now to pay appellant $1,000.00 would be simply to replace in appellant's purse money which appellant never owned and which it was properly required to return to the owner."

The judgment of the trial court is affirmed.

Simpson, C. J., Millard, Blake, and Mallery, JJ., concur.