[No. 29516. Department Two. June 23, 1945.]

OMICRON COMPANY, INC., et al., Appellants, v. CENTRAL SURETY & INSURANCE CORPORATION, Respondent.[1]

[1] Reported in 160 P. (2d) 629.

*Patterson & Patterson,* for appellants.

*Eggerman, Rosling & Williams,* for respondent.

BLAKE, J.—The identical facts giving rise to this action have been the subject of litigation in two other cases: *Mathewson v. Carlson,* 13 Wn. (2d) 363, 125 P. (2d) 272; and *Omicron Co., Inc. v. United States F. & G. Co.,* 21 Wn. (2d) 703, 152 P. (2d) 716.

The facts may be summarized as follows: Mathewson held in trust certain funds which, for convenience, were on deposit with a bank in the name of one Hazel Kirk. The account was carried in her name because Mathewson suffered from a physical disability which made it very difficult for him to sign his name. That Hazel Kirk had no authority to draw checks on the account without express authorization by Mathewson, is beyond dispute. *Mathewson v. Carlson, supra.*

On August 7, 1940, however, she did draw a check on the account, in favor of Omicron Company, Inc., without the knowledge or consent of Mathewson. At the same time, she signed Mathewson's name (also without his knowledge or consent) to an offer to purchase certain real property owned by Omicron. The check and offer to purchase were presented on August 8th to an officer of the company by one Carlson, a real estate broker. The officer informed Carlson that the offer would not be considered unless Hazel Kirk also signed it. This she did, but with the following restriction: "It is understood that Wm. Mathewson is sole purchaser and I am signing no other documents regarding transaction."

The same day, August 8th, the Omicron Company caused the check to be certified, and, on August 19th, informed Mathewson, Kirk, and Carlson, by letter, that the offer to purchase was accepted.

A day or two later, Mathewson and Miss Kirk appeared at the office of the Omicron Company. They informed the

president of the company that Hazel Kirk had drawn the check and signed the offer to purchase without Mathewson's knowledge or consent. The latter repudiated the transaction and demanded return of the check. The Omicron Company not only refused the demand, but shortly afterward declared a forfeiture under the terms of the offer to purchase, and cashed the check.

Mathewson brought an action against Carlson and the Omicron Company for the recovery of the thousand dollars, which culminated in a decision in his favor. *Mathewson v. Carlson, supra.* In deciding that case, we said, p. 367:

"The appellant contends that the trial court should have held that Mathewson knew of the signing of his name to the earnest money receipt by Miss Kirk and the giving of the check. Mathewson and Miss Kirk both testified, unequivocally, that he had no such knowledge, and that Miss Kirk had signed his name to the earnest money receipt without his authority or knowledge. It may be admitted that Carlson obtained the receipt and the check by reason of false and fraudulent representations made to Miss Kirk. The appellant at no time had any knowledge that the transaction had been conceived in fraud practiced by Carlson until Mathewson and Miss Kirk called upon the president manager and told him the situation, . . .

"The trial court found: 'That Hazel Kirk did not have authority to execute the check or copy of the earnest money receipt . . .'

"After giving attentive consideration to the testimony, we are of the opinion that the trial court's finding based thereon should not be disturbed. . . . Miss Kirk having signed Mathewson's name to the earnest money receipt without his knowledge or authority and having indicated, by a note which she placed upon the receipt, that she had no interest . . ."

After paying the Mathewson judgment, the Omicron Company brought an action against the United States Fidelity & Guaranty Company, as surety on the statutory bond required of Carlson as a real estate broker. *Omicron Co., Inc. v. United States F. & G. Co., supra.*

Defeated in that action, Omicron brought this action against defendant, the Central Surety & Insurance Corporation, upon

"a certain policy of insurance denominated 'Savings & Loan Blanket Bond, Standard Form No. 22,' wherein it was provided that the defendant would make good to 'insured,' to-wit, the plaintiff, Omicron Company, Inc., . . . 'all such losses as the said insured might sustain by reason of the forgery or alteration of any instrument, or . . . by reason of the loss of property through any other form of fraud or dishonesty by any person or persons whether employees or not.' "

The sum sought to be recovered is $1,679.17, which includes the amount paid on the Mathewson judgment and the costs and expenses incurred in defense of that action.

After consideration of the evidence adduced by plaintiff upon the issues presented, the court made findings of fact favorable to defendant, and entered a judgment of dismissal. Plaintiff appeals.

The appeal presents two questions: (1) whether appellant sustained a "loss . . . of *property* through any other form of fraud or dishonesty"; and (2) whether it sustained any loss "by reason of the *forgery* of [an] instrument."

■ We think the first question is effectually disposed of by our decision in *Omicron Co., Inc. v. United States F. & G. Co., supra,* notwithstanding the difference in phraseology of the conditions of the "policy of insurance" now before us and those of the realtor's bond in that case. The pith of the decision is contained in the following language, p. 707:

"The sole and only reason why Mathewson recovered the one thousand dollars from Omicron in the first action *(Mathewson v. Carlson et al.)* is because Omicron never had any ownership or right to the one thousand dollars or any part of it. It was Mathewson's money all the time. Omicron was no more legally damaged *in the sum of one thousand dollars* by being compelled to return Mathewson's money to him than it would have been damaged in a like sum had it been compelled to return to its rightful owner a thousand dollars which it had found on the street."

■ But, says appellant, it is out $467.66, "representing the costs and expenses of endeavoring to defend said action by said William Mathewson . . ."

It may be conceded this was a loss of property, but it was not sustained "by reason of the fraud or dishonesty by any person . . . [Hazel Kirk nor Mathewson]." For, before hazarding its own money in an attempt to retain the one thousand dollars, in which it "never had any ownership or right," appellant was fully informed of all the facts upon which Mathewson based his right to the one thousand dollars. With knowledge of all the facts, appellant undertook, in its attempt to retain the one thousand dollars, the defense of Mathewson's suit. Clearly, the loss of money expended in the defense of that action was a risk voluntarily assumed by appellant.

■ Turning to the second question—whether appellant sustained a loss "by reason of the forgery . . . of [an] instrument . . ."—the trial court found as a fact:

"That the signing of the name of William Mathewson by Hazel Kirk to the earnest money receipt . . . does not constitute a 'forgery' within the coverage of the aforesaid bond."

We do not think that the evidence would admit of a finding to the contrary. There is no evidence that would justify an inference that Hazel Kirk wrote Mathewson's name on the offer to purchase with the intent to deceive anybody; indeed, the inference to be drawn from the evidence is that she made no attempt to imitate or simulate Mathewson's signature. She signed it in the presence, and at the behest, of Carlson. That he failed to disclose to Omicron that it was *not* Mathewson's signature, is not sufficient to supply the element of intent to defraud which is necessary to establish a forgery.

Judgment affirmed.

BEALS, C. J., ROBINSON, SIMPSON, and MALLERY, JJ., concur.